UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TIMOTHY S. OZERITIES,

        Plaintiff,        CIVIL ACTION NO. 13-cv-11911

  vs.

COMMISSIONER OF        MAGISTRATE JUDGE MONA K. MAJZOUB
SOCIAL SECURITY,

        Defendant.
_____/

**<u>OPINION AND ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT [10] AND GRANTING DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT [12]</u>**

Plaintiff Timothy Ozerities seeks judicial review of Defendant the Commissioner of Society Security's determination that he is not entitled to social security benefits for his physical and mental impairments under 42 U.S.C. § 405(g).  (Docket no. 1.)  Before the Court are Plaintiff's Motion for Summary Judgment (docket no. 10) and Defendant's Motion for Summary Judgment (docket no. 12).  With consent of the Parties, this case has been referred to the undersigned for final judgment in accordance with 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73.  (Docket no. 14.)  The Court has reviewed the pleadings, dispenses with a hearing under Eastern District of Michigan Local Rule 7.1(f)(2), and is now ready to rule.

**I.     PROCEDURAL HISTORY:**

Plaintiff filed an application for Disability Insurance Benefits and an application for Supplemental Social Security Income with protective filing dates of March 24, 2010, alleging that he had been disabled since July 15, 2007, due to mental impairments and problems with his knees caused by a motorcycle accident.  (*See* docket no. 10 at 5.)  The Social Security Administration

denied benefits. (*See* TR 13.) Plaintiff requested a *de novo* hearing, which was held on July 21, 2011, before Administrative Law Judge (ALJ) Jessica Inouye, who subsequently found that Plaintiff was not entitled to benefits because he was capable of performing a significant number of jobs in the national economy. (TR 13-23.) The Appeals Council declined to review the ALJ's decision (TR 1), and Plaintiff commenced the instant action for judicial review. Plaintiff and Defendant each filed their Motions for Summary Judgment.

## II. PLAINTIFF'S TESTIMONY, MEDICAL EVIDENCE, AND VOCATIONAL EXPERT TESTIMONY

### A. Plaintiff's Testimony

Plaintiff was 47 years old at the time of the administrative hearing and 43 years old at the time of alleged onset. (*See* TR 36.) Plaintiff lived with his father at the time of the hearing and was not working. Plaintiff has a high-school education and took some college classes while he was in the Air Force. (TR 44.) Before he was injured in a motorcycle accident in July 2007, Plaintiff was the head DJ at a bar in Wrigleyville in Chicago, IL. (TR 39.) Plaintiff suffered several injuries in the accident, and by the time he was able to attempt a return to work, he was unable to find a job as a DJ. (*See* TR 42-43.) Plaintiff indicated that he was no longer "astute to what [he was] doing with music," and he could no longer "go in front of the crowd and make things happen." (TR 42.) Plaintiff worked at a drive-in restaurant in Minnesota from July to October 2009, but he stopped working there because of problems with he back and legs and because the people he worked with would call him "retarded" and "make fun of [him] for the way that [he] was working and talking with them." (TR 40-41.) Plaintiff stayed in Minnesota to care for a friend with terminal cancer and moved to Florida for a short time, but ultimately, he returned to Saginaw, Michigan to live with his father. (TR 41-43.) Plaintiff no longer drives, but he does ride a bicycle. (TR 44.)

Plaintiff testified that while he was in Florida, he walked to the edge of a building and considered committing suicide. He did not jump, though he met with a social worker following the incident. Plaintiff acknowledged that he told the social worker that he thought he could find work in Chicago, but when the social worker suggested that he could apply for social-security benefits, he moved back to Michigan and filed his application. (*See* TR 42-43.)

With regard to his accident, Plaintiff testified that he hit a car that ran a red light, rode up on the hood, and was thrown 30 feet. (TR 54-55.) After the accident, his head was numb, and he lost most of his teeth. (TR 54.) The right side of his face drooped following the accident, but he had been working with a doctor at the VA using low-frequency electrical impulse treatments, which had improved the drooping. (TR 55.) Plaintiff testified that because of problems with his leg, he could only walk about a quarter of a mile before his leg would give out. (TR 58.)

Plaintiff told the ALJ that in addition to problems with his legs, he could no longer work because of problems with pain in his back and his neck. (TR 46.) He testified that even though he worked in Minnesota, he "worked . . . so hard that [he] broke down and . . . [his] body like got worse in that degree (sic)." (TR 46.) Plaintiff stated that his back and neck hurt and that his leg would get numb, but it was a little easier to walk around during the summer. (TR 47.) He testified that he fell a couple of times because his leg was hard to move. (TR 48.) When the ALJ asked Plaintiff why his medical record showed no signs of trouble with his back and legs between the time of his accident in July 2007 and when he returned to Saginaw in 2010, Plaintiff indicated that he "was walking it off, trying to keep on going, and it was slowly . . . falling apart where [he] wasn't getting better." (TR 48-49.) When the ALJ asked why Plaintiff hadn't mentioned the problems to his VA doctors even though he had been treated for other problems, Plaintiff stated that he "saw a lot of people at the VA hospital that were in need of care more than [he] felt like [he] did" and that he

3

"didn't want to complain about everything that was going wrong with [him] because [he] thought that [he] was going to get better." (TR 49-50.)

Plaintiff was referred to physical therapy by the VA in Michigan when he went to see them about his back and leg pain. The ALJ then asked Plaintiff why he did not attend physical therapy, and he stated that it was in the middle of winter and that he couldn't get to the VA because his car had broken down. (TR 51.) Plaintiff stated that he had not started any physical therapy even through the weather had changed because he "could do a better job of it [himself] by walking around in [his] neighborhood and riding a bicycle." (TR 52.)

Plaintiff further testified that he could not work because of depression, anxiety, and PTSD. (TR 52.) He told the ALJ that he "can't put things together like [he] used to[, a]nd socially [he is] a bit of a misfit." (TR 52.) Plaintiff stated that he doesn't "fit in the world," but he is okay being around other people once he gets to know them. (TR 53-54.) Before his accident, though, Plaintiff "used to be quick and very interactive with everybody." (TR 54.)

### B. Plaintiff's Father's Testimony

Plaintiff's father testified at his hearing and indicated that Plaintiff had been living with him for about a year and a half. He stated that on a typical day, he would leave the house around 9:30 a.m., and Plaintiff would still be sleeping. Plaintiff's father would call him "maybe at noon or so" to get him up. He stated that Plaintiff would cut the grass or help him get the groceries and that in the wintertime, Plaintiff would shovel snow. Plaintiff would then take a nap in the late afternoon or evening and stay up until around 2:00 a.m. (TR 60.) Plaintiff's father testified that Plaintiff did not walk much because of his leg, but he rode his bicycle "quite a lot." He stated that Plaintiff's energy is "short-lived." He told the ALJ that Plaintiff could usually mow the lawn with their riding lawn mower until he finished. (TR 61.)

4

Plaintiff's father also stated that although they got along "pretty good," Plaintiff could get easily frustrated "if something don't (sic) go right." (TR 61.) He noted that he and Plaintiff could work together on projects, and while Plaintiff would not "fully understand the whole mechanics," once they talked about it, Plaintiff could handle it. He told the ALJ that Plaintiff could perform a job as explained by a supervisor, but the supervisor would likely have to re-explain the instructions if Plaintiff were asked to perform the same job again. He then told the ALJ that Plaintiff had problems with short-term memory, dyslexia, and color blindness." He stated that Plaintiff would often get something in the mail and have his father explain the substance to him. (TR 62.) Plaintiff's father testified that he believed these issues started after Plaintiff's accident, but he was not certain. (TR 63.)

Plaintiff's father testified that at one point while living with him, Plaintiff considered asking an acquaintance for a job with a lawn-care service. Plaintiff's father reminded him that they use push mowers and that they usually work for 12 hours a day. Plaintiff then told his father that he probably could not push a mower for very long, and he decided not to pursue the job. (TR 65.) The ALJ asked Plaintiff's father if he was requiring Plaintiff to look for a job while living under his roof; Plaintiff's father stated that "he really, really feels strongly about being a DJ, and he's very frustrated that nothing in Michigan has opened up." (TR 66.)

### C. Medical Record

Plaintiff sets forth a brief procedural history and discusses the ALJ's basis for denying his benefits, but he does not directly discuss his medical record. (Docket no. 10 at 5-6.) Defendant's account of Plaintiff's medical history is largely consistent with the ALJ's discussion of the medical record except that Defendant's account of the record includes almost solely the evidence in support of Defendant's position. (See docket no. 12 at 6-11) Therefore, the Court hereby incorporates by

5

reference the medical record as set forth in the ALJ's opinion. (TR 18-21.) The Court has, however, conducted an independent review of Plaintiff's medical record and will incorporate comments and citations as necessary throughout this Report and Recommendation.

### D. The Vocational Expert

The ALJ asked the VE to consider a hypothetical individual who was of the same age and had the same educational and work experience as Plaintiff. She told the VE to assume that the individual "could perform work which is nonproduction oriented, simple and unskilled with an SVP of 1 or 2. The ALJ added that the work must be "routine and repetitive type of work" and that the individual "should not work in close proximity to co-workers, meaning the individual could not function as a member of a team, and with minimum direct contact with the public." The ALJ then asked the VE to assume that the individual "should work in a low stress work environment with only occasional changes in the work and only occasional decision making required as part of the work but still within the other simple, unskilled, routine, repetitive parameters." (TR 71.) The ALJ also told the VE to assume that this individual could perform work in a light exertional range but "should not push or pull bilaterally with the lower extremities more than occasionally" and "should avoid concentrated exposure to hazards of unprotected heights, moving machinery, and vibrations." The ALJ further stated that the individual should "avoid concentrated exposure to extreme temperatures, . . . should not be required to climb ladders, ropes or scaffolds, . . . [and] should not be required to read more than a very basic reading as part of the job." (TR 72.) When asked, the VE testified that such an individual could perform Plaintiff's past work as a "cook helper." (TR 72.)

The ALJ then asked the VE to consider a second hypothetical person. The ALJ told the VE to assume that the individual had the same limitations as the first hypothetical person but to also assume that the individual "could stand and walk with normal breaks for a total of two hours in an

eight-hour work day and can sit with normal breaks for a total of six hours in an eight-hour work day." The ALJ added that this individual "should also not be required to kneel or crawl." (TR 72.) The VE testified that such an individual could not perform Plaintiff's past work, but the individual could perform other work in the economy. (TR 72-73.) Specifically, and as relevant to Plaintiff's contentions, the VE stated as follows:

> Yes. It's going to bring us down to sedentary. Per the definition of sedentary is that it's nonproduction-paced. So for the machine operator or tender, we have approximately 1300 in the region of Michigan, 44,000 nationally. An example is semiconductor bonder. DOT 726.658-066. For the production worker or assembler, approximately 2400 in the region, 28,000 nationally. An example is final assembler. 713.687-018. And for the inspector, about 700 in the region, 13,000 nationally. An example is table worker. DOT 739.687-182. All with an SVP of 2.

(TR 73.)

The ALJ then asked the VE how often an individual could be off task before it becomes work preclusive and how often an individual could be absent and hold a job. (TR 73.) The VE testified that employers expect their employees to be on task 94% to 95% of the time and that most employers tolerate six unexcused absences in a six-month period. (TR 73.) When asked, the VE testified that an individual would be unable to sustain employment if they were not able to work eight hours a day, five days a week due to a combination of mental and physical limitations. (TR 74.) Finally, the VE testified that his testimony had been consistent with the DOT. (TR 74.)

Plaintiff's attorney then asked the VE to explain how the "machine operator or tender" position would fit into the ALJ's hypothetical that required the individual to avoid exposure to moving or hazardous machinery. (TR 74.) The VE testified that "no occupation in [the sedentary unskilled category] has exposure to moving parts." (TR 74.)

### III. ADMINISTRATIVE LAW JUDGE'S DETERMINATION

The ALJ found that Plaintiff met the disability insured status requirements through June 30,

7

2012, had not engaged in substantial gainful activity since July 15, 2007, and suffered severe closed-head injury and depression; but he did not have an impairment or combination of impairments that met or equaled the Listing of Impairments. (TR 15-17.) The ALJ found that Plaintiff's allegations regarding the extent of his symptoms were not wholly credible (TR 19) and that Plaintiff had the following residual functional capacity:

> [Plaintiff can] perform light work . . . except he can stand and walk, with normal breaks, for two hours in an eight-hour workday and sit, with normal breaks, for six hours in an eight-hour workday. The claimant should not be required to kneel or crawl. He should not push or pull bilaterally with the lower extremities more than occasionally and within the aforementioned weight restrictions. The claimant should avoid concentrated exposure to hazards of unprotected heights, moving machinery, vibrations, and extreme temperatures. He should not be required to climb ladders, ropes or scaffolds. The claimant can perform work that is non-production oriented, simple, unskilled with an SVP of one or two that is routine and repetitive. He should not work in close proximity to coworkers (meaning he could not function as a member of a team). The claimant should have minimal direct contact with the public in a low stress environment (meaning only occasional changes in the work and decision-making required). HE should not be required to do more than basic reading as part of the job.

(TR 17-18.) In reliance on the VE's testimony, the ALJ found that Plaintiff could perform work as a machine operator, a production worker, or an inspector. (TR 22-23.) Therefore, the ALJ found that Plaintiff could perform a significant number of jobs in the national economy, and he was not suffering from a disability under the Social Security Act at any time from July 15, 2007, through the date of the ALJ's decision. (TR 22-23.)

## IV. LAW AND ANALYSIS

### A. Standard of Review

Pursuant to 42 U.S.C. § 405(g), this Court has jurisdiction to review the Commissioner's final decisions. Judicial review of the Commissioner's decisions is limited to determining whether his findings are supported by substantial evidence and whether he employed the proper legal

standards. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Walters v. Comm'r*, 127 F.3d 525, 528 (6th Cir. 1997). Substantial evidence is more than a scintilla but less than a preponderance; it is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson*, 402 U.S. at 401 (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *Walters*, 127 F.3d at 528. It is not the function of this Court to try cases *de novo*, resolve conflicts in the evidence, or decide questions of credibility. *See Brainard v. Sec'y of Health and Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

In determining the existence of substantial evidence, the court must examine the administrative record as a whole. *See Kirk v. Sec'y of Health and Human Servs.*, 667 F.2d 524, 536 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, even if the reviewing court would decide the matter differently, *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983), and even if substantial evidence also supports the opposite conclusion. *See Her v. Comm'r*, 203 F.3d 388, 389-90 (6th Cir. 1999); *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts").

      **B.**     **Framework for Social Security Determinations**

Plaintiff's Social Security disability determination was made in accordance with a five-step sequential analysis. In the first four steps, Plaintiff was required to show that:

     (1)     Plaintiff was not presently engaged in substantial gainful employment; and

     (2)     Plaintiff suffered from a severe impairment; and

     (3)     the impairment met or was medically equal to a "listed impairment;" or

     (4)     Plaintiff did not have the residual functional capacity (RFC) to perform relevant past

work.

*See* 20 C.F.R. § 404.1520(a)-(f). If Plaintiff's impairments prevented Plaintiff from doing past work, the Commissioner, at step five, would consider Plaintiff's RFC, age, education, and past work experience to determine if Plaintiff could perform other work. If not, Plaintiff would be deemed disabled. *See id.* at § 404.1520(g). The Commissioner has the burden of proof only on "the fifth step, proving that there is work available in the economy that the claimant can perform." *Her*, 203 F.3d at 391. To meet this burden, the Commissioner must make a finding "supported by substantial evidence that [the claimant] has the vocational qualifications to perform specific jobs." *Varley v. Sec'y of Health and Human Servs.,* 820 F.2d 777, 779 (6th Cir. 1987). This "substantial evidence" may be in the form of vocational expert testimony in response to a hypothetical question, "but only 'if the question accurately portrays [the claimant's] individual physical and mental impairments.'" *Id.* (citations omitted).

### C. Analysis

The Social Security Act authorizes "two types of remand: (1) a post judgment remand in conjunction with a decision affirming, modifying, or reversing a decision of the [Commissioner] (a sentence-four remand); and (2) a pre-judgment remand for consideration of new and material evidence that for good cause was not previously presented to the [Commissioner] (a sentence-six remand)." *Faucher v. Sec'y of Health and Human Servs.*, 17 F.3d 171, 174 (6th Cir. 1994) (citing 42 U.S.C. § 405(g)). Under a sentence-four remand, the Court has the authority to "enter upon the pleadings and transcript of the record, a judgment affirming, denying, or reversing the decision of the [Commissioner], with or without remanding the cause for a hearing. 42 U.S.C. § 405(g). Where there is insufficient support for the ALJ's findings, "the appropriate remedy is reversal and a sentence-four remand for further consideration." *Morgan v. Astrue*, 10-207, 2011 WL 2292305, at

*8 (E.D.Ky. June 8, 2011) (citing *Faucher*, 17 F.3d at 174). Plaintiff asserts that Defendant's decision should be reversed or remanded for further proceedings because (1) the ALJ failed to properly evaluate the medical opinions of record; (2) the ALJ failed to properly evaluate Plaintiff's credibility[1]; and (3) the ALJ relied on flawed vocational-expert testimony where the VE's testimony was inaccurate. (Docket no. 10 at 6.)

### 1. Weight of the Medical Opinions

The ALJ must give a treating physician's opinion complete deference if it is supported by clinical and laboratory diagnostic evidence and it is not inconsistent with the other substantial evidence in the record. 20 C.F.R. § 404.1527(c)(2). It is equally well settled that the ultimate issue of disability is reserved to the Commissioner and not the treating or examining physician. *Kidd v. Comm'r*, 283 Fed. Appx. 336, 341 (6th Cir. 2008). Thus, when a medical or non-medical source offers an opinion on "an issue reserved to the Commissioner, such as whether the claimant is disabled, the ALJ need not accord that opinion controlling weight." *Id.* (citing *Bass v. McMahon*, 499 F.3d 506, 511 (6th Cir. 2007)). The opinion of an examining source is generally accorded more weight than is the opinion of a source who did not examine the claimant. 20 C.F.R. § 404.1527(c)(1). The opinion of a state agency medical or psychological consultant is reviewed in

---

[1] Plaintiff asserts that the ALJ's failure to properly evaluate Plaintiff's credibility and the medical opinions of record resulted in the forming of inaccurate hypothetical questions to the VE. (*See* docket no. 10 at 6.) As an initial matter, the ALJ is only required to incorporate in her hypotheticals those limitations that she finds credible and supported by the record. *See Casey v. Sec'y of HHS*, 987 F.2d 1230, 1235 (6th Cir. 1993). Here, the ALJ included all of the limitations that she found credible in Plaintiff's RFC, and she included all of the same limitations in her hypothetical questions to the VE. Thus, the ALJ's hypothetical questions were not "inaccurate" as a matter of law. Moreover, although couched in terms of "inaccurate hypothetical[s]," Plaintiff's argument substantively questions the ALJ's evaluation of Plaintiff's credibility his medical records. Thus, the Court will consider Plaintiff's arguments with regard to the ALJ's ultimate determination of Plaintiff's limitations and not with regard to how those limitations were presented to the VE.

11

the same manner as is the opinion of a nonexamining physician or psychologist. 20 C.F.R. §404.1527(e).

The Commissioner requires its ALJs to "always give good reasons in [their] notice of determination or decision for the weight [they] give [a] treating source's opinion." 20 C.F.R. § 404.1527(c)(2). Those good reasons must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Wilson v. Comm'r*, 378 F.3d 541, 544 (6th Cir. 2004) (citing Social Security Ruling (SSR) 96-2p, 1996 WL 374188, at *5 (1996)). If the opinion of a treating source is not afforded controlling weight, an ALJ must apply certain factors in determining what weight to give the opinion, including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source. *Wilson*, 378 F.3d at 544 (citation omitted). Even then, a finding that a treating-source medical opinion is not well supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to controlling weight, not that the opinion should be rejected. Social Security Ruling (SSR) 96-2p, 1996 WL 374188, at *4.

Nevertheless, the Sixth Circuit has upheld the decision of an ALJ which gave less than controlling weight to a treating physician without specifically analyzing the factors set forth in 20 C.F.R. § 404.1527(c) where the ALJ provided "good reason" for the decision. *See Infantado v. Astrue*, 263 Fed.Appx. 469, 473-74 (6th Cir. 2008). There is no per se rule that requires an articulation of each of the six regulatory factors listed in 20 C.F.R. § 404.1527(c)(2)-(6). *Norris v. Comm'r*, No. 11-11974, 2012 WL 3584664, at *5 (E.D. Mich. Aug. 20, 2012) (citing *Tilley v.*

*Comm'r*, 394 Fed. Appx. 216, 222 (6th Cir. 2010)). Moreover, an ALJ's failure to discuss the factors of § 1527(c)(2)-(6) may constitute harmless error (1) if "a treating source's opinion is so patently deficient that the Commissioner could not possibly credit it;" (2) "if the Commissioner adopts the opinion of the treating source or makes findings consistent with the opinion;" or (3) "where the Commissioner has met the goal of [Section 1527(c)]—the provision of the procedural safeguard of reasons—even though she has not complied with the terms of the regulation." *Nelson v. Comm'r*, 195 Fed. Appx. 462, 470 (6th Cir. 2006) (citing *Wilson*, 378 F.3d at 547).

Plaintiff's arguments with respect to the medical opinions of record are disjointed and unavailing. For example, Plaintiff questions the ALJ's discussion of the medical records of Mark Zaroff, Ph.D, and Joe DeLoach, Ph.D., with regard to Plaintiff's mental functioning. (*See* docket no. 10 at 13.) Plaintiff notes that the ALJ gave "some weight" to Dr. Zaroff's opinion and "considerable weight" to Dr. DeLoach's opinion and then asks the following rhetorical question in the form of a statement:

> So, the ALJ discounts a medical opinion from someone that actually examined and interviewed Mr. Ozerities because it "shows the previous condition of the claimant," but gives "considerable weight" to a medical opinion given only a month later by someone that only read pieces of paper?

(*Id.*) Plaintiff then notes that the ALJ "discounted the opinion of Dr. [Elaine] Carroll because 'although the doctor does have a treating relationship with the claimant . . . the record reveals that his treatment visits have been routine." Plaintiff then asks, "What is routine about a person suffering from a mental illness going to therapy sessions, medication reviews, taking medications as prescribed and receiving neurofeedback therapy. . . ?" (*Id.* at 13-14.) And he concludes that "[a] person does not need to undergo electroshock therapy or be instutionalized to show that their mental conditions are disabling." (*Id.* at 14.) Plaintiff also notes that the ALJ discounted the opinion of

13

Plaintiff's physician, Dr. K. Raval. (*Id.*)

While these questions and statements imply that Plaintiff believes the ALJ improperly weighed the various opinions, Plaintiff provides no suggestion regarding what opinions that ALJ did not incorporate into Plaintiff's RFC. Plaintiff suggests that the ALJ should have afforded more weight to Dr. Zaroff's opinions, but Plaintiff does not allege what (if any) additional limitations would have resulted from such weight. As Defendant asserts, the only "opinions" provided by Dr. Zaroff were that Plaintiff "required more support and encouragement than a typical patient," that he "seems to have very limited motiviation and interest in moving forward," and that he had a GAF score of 48. (*See* TR 21.) These "opinions" do not include any additional functional limitations. And with regard to the opinions of Drs. Carroll and Raval, as Defendant notes, they did not provide any opinions with regard to Plaintiff's mental impairments. Instead, they merely provided GAF scores. (*See* docket no. 12 at 15.)

Plaintiff also asserts that the ALJ failed to properly analyze the opinion of Plaintiff's psychotherapist, Ed Langham, LMSW. (Docket no. 10 at 17-18.) As Defendant notes, a social worker is not an "acceptable medical source," and such opinions are not "medical opinions." 20 C.F.R. §§ 404.1513(a); 404.1527(a)(2); 416.913(a); 416.927(a)(2). Nevertheless, the Commissioner recognizes that opinions from sources that are not "acceptable medical sources" may contain valuable information that may be useful in assessing the severity of a claimant's impairments. 20 C.F.R. §§ 404.1513(d); 416.913(d); Social Security Ruling (SSR) 06-3p, 2006 WL 2329939, at *2 (Aug. 9, 2006). SSR 06–3p clarifies that other source opinions "may be based on special knowledge of the individual" and may be important sources of information in determining the severity of the claimant's impairments and how the impairments affect the claimant's functional capabilities. SSR 06-3p, 2006 WL 2329939, at *2 (Aug. 9, 2006). Here, however, the ALJ did give some (albiet,

14

little) weight to Mr. Langham's opinions. (*See* TR 21.) And ALJ only discounted Mr. Langham's opinions to the extent that they were inconsistent with the medical evidence of record. (*Id.*)

The ALJ did not analyze the factors set forth in 20 C.F.R. § 404.1527(c)(2)-(6), but the Court finds that the ALJ's failure to do so is harmless error. The opinions that Plaintiff asserts were not properly weighed do not provide any additional limitations that the ALJ failed to include in Plaintiff's RFC. Therefore, the Court finds that the ALJ made a decision consistent with these opinions.

### 2. Plaintiff's Credibility

"[A]n ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility." *Walters v. Commissioner*, 127 F.3d 525, 531 (6th Cir. 1997). But Credibility assessments are not insulated from judicial review. Despite the deference that is due, such a determination must nevertheless be supported by substantial evidence. *Id.* An ALJ's credibility determination must contain "specific reasons . . . supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96–7p. "It is not enough to make a conclusory statement that 'the individual's allegations have been considered' or that 'the allegations are (or are not) credible.'" *Id.* "The adjudicator may find all, only some, or none of an individual's allegations to be credible" and may also find the statements credible to a certain degree. *See id.*

Further, to the extent that the ALJ found that Plaintiff's statements are not substantiated by the objective medical evidence in the record, the Regulations explicitly provide that "we will not reject your statements about the intensity and persistence of your pain or other symptoms or about

15

the effect your symptoms have on your ability to work . . . solely because the available objective medical evidence does not substantiate your statements." 20 C.F.R. § 416.929(c)(2). The ALJ must consider: (1) the claimant's daily activities, (2) the location, duration, frequency, and intensity of claimant's pain, (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms, (5) treatment, other than medication, for pain relief, (6) any measures used to relieve the pain, and (7) functional limitations and restrictions due to the pain. *See* 20 C.F.R. § 416.929(c)(3); *see also Felisky v. Bowen*, 35 F.3d 1027, 1039-40 (6th Cir. 1994) (applying these factors).

Plaintiff argues that "'the ability to do household chores'" and "having 'sufficient concentration to shop and watch television' . . . does not equate to performing work on a regular and sustained basis." (Docket no. 10 at 10.) And Plaintiff asserts that whether Plaintiff worked after the alleged onset date "does not equate to . . . being able to work on a sustained basis." (*Id.* at 12.) And he notes, without discussion, that the ALJ "opines 'the medical records reveal that the medications and therapy have been relatively effective in controlling the claimant's symptoms when he was involved in treatment.'" (*Id.* at 11.)

These findings, however, are only a sample of the ALJ's overall credibility determination:

Overall, the undersigned finds the claimant partially credible. His activities of daily living are no doubt limited, but he acknowledges the ability to do occasional household chores, and sufficient concentration to shop and watch television. He is independent in personal care. His treatment has been routine and conservative in terms of his physical and mental conditions. Despite the complaints of allegedly disabling symptoms there have been significant periods of time since the alleged onset date during which the claimant has not received medication or treatment for those symptoms. However, the medical records reveal that the medications and therapy have been relatively effective in controlling the claimant's symptoms which he was involved in treatment. The claimant alleges he sustained a disabling head injury in a vehicle accident but he did not initially go for emergency treatment and when he did, the findings were unremarkable although he had some dental problems possibly from the impact of the accident. He worked after the alleged onset date and

> although it was not considered substantial gainful activity, it shows his daily activities have been greater than generally reported. His allegations are credible to the extent that they are consistent with the limitations in the residual functional capacity outlined above, but beyond that, the allegations are given little weight.

(TR 19-20 (citations omitted).) The ALJ specifically discussed the claimant's daily activities, Plaintiff's allegations of pain and limitations, the type and effectiveness of Plaintiff's medications, and Plaintiff's treatment. The Court finds that the ALJ's analysis of Plaintiff's credibility is sufficiently specific to make clear to Plaintiff and the Court the weight that she gave to Plaintiff's statements and the reasons for that weight.

### 3. The Vocational Expert's Testimony

Plaintiff asserts that the VE gave inaccurate testimony when he testified that "Per the definition of sedentary is that it's nonproduction-paced." (Docket no. 10 at 19.) In support of this contention, Plaintiff cites to the C.F.R. definition of sedentary work:

> Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. § 404.1649(a); § 416.967(a). Plaintiff further asserts that two of the three jobs identified by the VE (the semiconductor bonder and the table worker) "both have 'moving machinery' per the definition[s] in the DOT," which was to be avoided under Plaintiff's RFC and the ALJ's hypothetical questions. (Docket no. 10 at 20-21.) Plaintiff points to the following definitions in support of this contention:

> **726.685-066; Bonder, Semiconductor**: Tends automatic bonding machine that bonds gold or aluminum wire to integrated circuit dies to connect circuitry to package leads: Reviews schematic diagram or work order to determine bonding specifications. Turns dials to set bonding machine temperature controls and to regulate wire feeding mechanism. Mounts spool of wire onto holder and inserts wire end through guides, using tweezers. Positions semiconductor package into magazine

> of automatic feed mechanism, and observes package, using microscope or equipment display screen, to ensure connections to be bonded are aligned with bonding wire. Adjusts alignment as necessary. Activates machine that automatically bonds wire to specified connections on semiconductor package leads. Removes packages from bonding machine and places packages in work tray. May test tensile strength of bonded connections, using testing equipment. May locate connections and bond wire to connect circuitry of hybrid circuits, using precision-bonding machine.
>
> **739.687-182; Table Worker**: Examines squares (tiles) of felt-based linoleum material passing along on conveyor and replaces missing and substandard tiles.

(*See* DOT Definitions; *available at* www.occupationalinfo.org.) Moreover, Plaintiff contends, "the semiconductor bonder definitely requires more than 'basic reading as part of the job.'" (*Id.* at 21-22.)

### a.     Whether Sedentary Work is Non-Production Paced

Defendant asserts that Plaintiff waived this argument by not questioning the VE at Plaintiff's hearing. (*See* docket no. 12 at 22-23, 28.) Defendant further contends that "[i]t is reasonable to believe that the VE was not speaking strictly in terms of a DOT or regulation definition, but rather was indicating the sedentary jobs by their terms are non-production-paced." (*Id.* at 28.)

SSR 00-4p provides that the adjudicator must resolve a conflict between the DOT and the VE "before relying on the VE . . . evidence." SSR 00-4p. But "[n]othing in SSR 00-4p places an affirmative duty on the ALJ to conduct an independent investigation into the testimony of witnesses to determine if they are correct." *Id.* (quoting *Martin v. Comm'r*, 170 F. App'x 369, 374 (6th Cir. 2006)). To the contrary, "an administrative law judge [need not] conduct his or her own investigation into the testimony of a vocational expert to determine its accuracy, especially when the claimant fails to bring any conflict to the attention of the administrative law judge." *Ledford v. Astrue*, 311 Fed. Appx. 746, 757 (6th Cir. 2009).

Here, Plaintiff's counsel did not bring this potential conflict to the ALJ's attention. And while the Court has remanded matters where the VE's DOT classification "casts doubt on the

evidence the ALJ relied on to make a determination, *see Underwood v. Comm'r of Soc. Sec.*, No. 12-12633, 2013 WL 3851002, *3 (E.D. Mich. July 25, 2013) (Tarnow, J.) (adopting Report and Recommendation of Majzoub, M.J.), the Court does not find that such doubt exists in this matter. The VE stated that his testimony was consistent with the DOT, and Plaintiff has provided no evidence to suggest that the ALJ should have questioned this testimony.

### b.     Whether the Stated Occupations Include Moving Machinery

Defendant acknowledges that Plaintiff's counsel did ask the VE whether the stated occupations required exposure to moving machinery, twice. Both times, the VE testified that they did not. Most importantly, though, Defendant notes that DOT descriptions contain lists of required activities, and the occupations at issue herein do not contain the "Moving Mech. Parts" activity. Thus, Defendant argues, while Plaintiff may interpret the definitions to require exposure to moving mechanical parts, the DOT does not indicate that such exposure is required, and the VE testified that no such exposure is required. Thus, Plaintiff's argument is unperuasive.

### c.     Whether the Semiconductor Job Requires More Than Basic Reading

As Defendant asserts, Plaintiff's argument fails for two reasons. First, Plaintiff did not bring the alleged discrepancy to the ALJ's attention. Second, and more importantly, Plaintiff cites no authority for his proposition. The DOT listing states that the semiconductor job only requires a reading level of 2, which includes the ability to read adventure stories and comic books or use a dictionary. (DOT 726.684-066). Plaintiff's contention that such reading is outside the scope of his RFC is unsupported.

Accordingly, **IT IS ORDERED**, that Plaintiff's motion for summary judgment is **DENIED**; that Defendant's motion for summary judgment is **GRANTED**.

Dated: May 28, 2014           s/ Mona K. Majzoub
                              MONA K. MAJZOUB
                              UNITED STATES MAGISTRATE JUDGE

**PROOF OF SERVICE**

I hereby certify that a copy of this Order was served upon Counsel of Record on this date.

Dated: May 28, 2014           s/ Lisa C. Bartlett
                              Case Manager